571 A.2d 361
IN THE MATTER OF STEPHEN P. KERNAN, AN
ATTORNEY AT LAW.

Argued January 17, 1990—Decided March 30, 1990.

*William R. Wood,* Deputy Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*John P. Morris* argued the cause for respondent (*Horuvitz, Perlow, Morris & Pirolli,* attorneys).

PER CURIAM.

In this attorney-disciplinary case, respondent, Stephen P. Kernan, was charged with violations of the Rules of Professional Conduct (*RPC*) arising out of two matters, one involving his

own matrimonial action, the other relating to the disbursement of escrow funds. Following a determination by the District Ethics Committee (DEC), the Disciplinary Review Board (DRB) found that respondent had engaged in unethical conduct. In the matrimonial matter, this entailed respondent's failure to inform the court of the fact that he had transferred property that he had previously certified to the court as an asset. In the other matter, the ethics violation related to respondent's failure to pay the medical bill of a doctor from an escrow account established in connection with the settlement of a personal injury case on behalf of a client. By a five-two vote, the DRB recommended the suspension of respondent for three months; the dissenters would have given respondent a public reprimand.

## I.

The facts comprising the charged conduct are relatively uncomplicated. Both incidents occurred in the Spring of 1987, although they appear to be otherwise unrelated.

## A.

On April 10, 1987, respondent appeared *pro se* in court at a divorce settlement hearing in conjunction with a post-judgment application by respondent's ex-wife for support arrearages, distribution of property, and counsel fees. Four days before the hearing, on April 6th, respondent submitted to the court a case information sheet, which contained a list of his assets. Those assets included a computer, an automobile that was financed, and an 11.5 acre unimproved lot. However, one day before the hearing, respondent transferred to his mother, by quitclaim deed and for no consideration, the unimproved lot. According to his own testimony, he wanted to exclude this asset from the marital property that would otherwise be subject to a judgment for distribution in favor of his wife. At the time of the transfer, however, respondent informed neither the court, opposing counsel, nor his ex-wife. At the settlement confer-

ence held immediately prior to the hearing itself, on April 10th, respondent failed to disclose the conveyance. Respondent also failed to amend the certification of assets that he had previously submitted to the court as part of the case information statement. Not until directly questioned by the court at the hearing did respondent reveal the fact that he had conveyed the property.

The DEC found that respondent had violated *RPC* 8.4(c) by conduct involving dishonesty, fraud, deceit, or misrepresentation, and *RPC* 8.4(d), by conduct prejudicial to the administration of justice. The DRB agreed that respondent's actions violated *RPC* 8.4(c) and (d). The DRB also found that respondent had ignored his duty of candor toward the court in violation of *RPC* 3.3(a)(1) and (5).

Respondent's conduct in this matter involved deceit and misrepresentation. However, it goes well beyond mere non-disclosure. The conveyance itself was purported fraud, a seemingly dishonest act and plainly destructive of the sound and proper administration of justice. In assessing this conduct, the DRB found that "[r]espondent blatantly attempted to defraud both the court and his wife. This serious misconduct directly undermined the administration of justice." Though respondent was acting *pro se* at the time, he was still a member of the bar and an officer of the court. " 'The court has the right to rely upon the integrity of its officers....' " *In re Wolk*, 82 *N.J.* 326, 330, 413 *A.*2d 317 (1980) (quoting *In re Cahill*, 66 *N.J.L.* 527, 530, 50 *A.* 119 (E. & A.1901)). Respondent explained his actions by claiming that he wanted to avoid a judgment against the property only in order to subdivide the property, enhance its value, and sell it at a greater profit, but that he did not want ultimately to cheat his ex-wife. This private motive, however, even if accepted, does not excuse conduct that was otherwise dishonest and deceitful. We agree with the DRB's conclusion that respondent's actions violated the prohibitions of *RPC* 8.4 against conduct that is dishonest, fraudulent or deceitful, or that is prejudicial to the administration of justice.

Additionally, respondent knowingly made a false certification. *In re Kushner*, 101 *N.J.* 397, 403, 502 *A.*2d 32 (1986). When respondent failed to amend the certification of his assets to disclose the transfer of the ownership of the 11.5 acre lot, he imperiled the ability of the court to determine the truth of the matter and reach a just result. If his actions were not calculated to cheat his ex-wife or, indeed, to commit a fraud on the court itself, there can be no legitimate reason for his failure to inform the court of his unilateral transfer of the property and his purpose to sell the property. The failure to disclose "material facts to the court," that can mislead the court was clearly in derogation of respondent's "obvious duty to be candid and forthright with the court." *In re Whitmore*, 117 *N.J.* 472, 477, 569 *A.*2d 252 (1990). In this regard, we conclude, further, as did the DRB, that respondent violated *RPC* 3.3(a)(5).

## B.

The second matter involved respondent's representation of a client, Richard Servais, in connection with a personal-injury claim. Servais allegedly sustained injuries during a scuffle with security guards at Resorts International Hotel and Casino (Resorts) in Atlantic City, New Jersey. Servais had retained different counsel, Robert E. Bailey, to litigate the case, but chose to retain new counsel, respondent, after the case was settled for $17,500.

As a result of this switch in attorneys, on March 12, 1987, Bailey transmitted to respondent a check from his trust account for $4,966.94, the amount of unpaid medical bills incurred in connection with Servais' injuries.[1] The DRB found that respondent accepted the check with the knowledge that he was to negotiate compromises for as many of the remaining bills as possible and forward the balance, if any, to Servais.

---

[1] On March 20, 1987, Bailey sent respondent a list of outstanding medical bills totaling $5,117.94. The discrepancy in amounts was not explained.

Included in the list of outstanding bills was a $625 bill from Dr. Roland Fisher, one of Servais' treating physicians. By letter dated March 23, 1987, respondent wrote to Dr. Fisher inquiring whether he would accept $400 rather than $625 in satisfaction of his services. Dr. Fisher replied that he would not compromise. Respondent subsequently paid most of the other outstanding medical bills; apparently, respondent was able to compromise those other bills.

Respondent, however, did not pay any funds to Dr. Fisher.[2] Respondent testified that he had discussed the payment of Dr. Fisher's bill with Servais and that Servais had instructed him not to pay the bill and had requested the balance of the funds be returned to him. Servais testified that he could not recall instructing respondent regarding the payment or non-payment of Dr. Fisher's bill, but that he believed all medical bills had previously been paid by Bailey.

Both the DEC and the DRB found Servais to be more credible than respondent. They found that respondent received the funds for the purpose of paying Servais' outstanding medical bills. Respondent apparently understood, whether from Servais or Bailey, that all medical bills were to be paid from those funds. It is also clear that Dr. Fisher's bill was outstanding and that respondent did not pay this bill. It is undisputed that respondent took from those funds a fee for his work in the case and, on May 5, 1987, sent Servais a check for $1,386.94, the balance of the trust account.

The DEC concluded that respondent received funds in which a third party, Dr. Fisher, had an interest and refused to deliver those funds to the third party, in violation of *RPC* 1.15(b);

---

[2]Bailey testified that he had intended to use Dr. Fisher as one of his key witnesses at trial, but that after meeting with Dr. Fisher in preparation for trial, he became concerned about the quality of Dr. Fisher's recordkeeping and his ability to hold up on the stand. At this point, Bailey testified that he decided not to use Dr. Fisher as a witness, and in fact, decided to settle the case, rather than risk a trial.

further, that money owed to Dr. Fisher had not been segregated and, in fact, had been taken as legal fees by respondent, in violation of *RPC* 1.15(c). The DRB concluded that respondent had failed to segregate funds in which he and a third party shared an interest, in violation of *RPC* 1.15(b) and (c).

*RPC* 1.15(b) provides: "Upon receiving funds or other property in which a client or a third person has an interest, a lawyer shall promptly notify the client or third person." The funds that respondent received in this case were clearly subject to the stricture of this RPC. Third persons, the unpaid doctors, and the client, Servais, had interests in the fund that was transferred to respondent by former counsel, Bailey.

We, however, do not discern enough clarity in the record to enable us to conclude by clear and convincing evidence that respondent's instructions with respect to the disposition of those escrow funds were sufficiently definitive to provide a standard by which to gauge the propriety of his conduct. Bailey informed respondent by letter that Servais had "requested the fund [sic] be given directly to him [Servais], but I don't think that would be appropriate since your firm is representing him concerning these bills." The DRB construed this letter as evidence that respondent's instructions were to pay all doctor's bills. The DRB, finding that respondent was clearly instructed to pay all doctors' bills, including specifically Dr. Fisher's, then concluded that respondent "disregarded those instructions and disbursed the funds arbitrarily, in the face of his knowledge that Dr. Fisher had an unpaid claim." The DRB also concluded that "[r]espondent's acceptance of the funds gave rise to his obligation to segregate the disputed amount, an obligation he totally disregarded."

After a careful review of the record, we cannot determine that respondent was under definitive instructions that clearly directed him to pay Dr. Fisher's bill. If respondent's underlying directions were as clear as found and described by the DRB, this would have triggered an obligation to safeguard or keep

these funds intact until the status of Dr. Fisher's bill was resolved. But without explicit instructions or a clear understanding to do so, and, in the absence of any independent, antecedent duty to Dr. Fisher, he was not obligated to do so.

Nevertheless, under the circumstances, respondent acted unwisely and improperly in unilaterally determining how to dispose of the escrow moneys without clarifying his client's wishes and attempting to resolve any potential conflict of interest between the client, the doctor, and, indeed, himself to the extent he believed he was entitled to counsel fees. At the very least, it would have been sensible to have maintained the funds in order to seek such clarification. *Compare In re Gioia*, 91 *N.J.* 378, 380, 450 *A.*2d 1328 (1982) ("Respondent was under no obligation to guarantee complainant's bill, and could have avoided this situation by forwarding the entire balance of the settlement directly to his client.") *with In re Chasan*, 91 *N.J.* 381, 384, 450 *A.*2d 1329 (1982) (discipline imposed where attorney's taking of unauthorized additional fee damaged his client).

The surrounding facts that bear on the ethical standards applicable to this event are further muddled by the vagueness of respondent's interest, *i.e.*, his entitlement to an attorney's fee, in these funds. The DRB determined that respondent had, or claimed, such an interest in the escrow moneys and that this implicated *RPC* 1.15(c). The plain language of *RPC* 1.15(c) addresses a lawyer's obligation with respect to funds in which the lawyer and a third party both claim interests. The focus of *RPC* 1.15(c), however, is on property held by a lawyer in which the lawyer and the third party may have competing interests. It is not clear whether these strictures also address the situation in which the client also may have a competing interest. The DRB found that respondent violated this RPC when he failed to pay Dr. Fisher *and* took his own fee from the funds before remitting the balance to Servais.

The record, again, does not elucidate the understanding between Servais and respondent with respect to the latter's en-

titlement to counsel fees, or, as earlier noted, whether the third party, Dr. Fisher, had either an enforceable claim against the fund or an interest in the fund that, minimally, should have been protected through actions by the attorney to preserve the fund. It is this state of the record that prevents us from determining under the clear and convincing evidence standard, the precise nature of respondent's obligations in the handling of the fund, and whether this conduct falls to the level of an ethics violation.

## II.

Based on the totality of respondent's conduct in the matrimonial matter and the *Servais* matter, the DRB recommended that respondent be suspended from the practice of law for a period of three months. In determining the appropriate punishment, we are mindful of our observation in *In re Nigohosian*, 88 *N.J.* 308, 315, 442 *A.*2d 1007 (1982): "The severity of discipline to be imposed must comport with the seriousness of the ethical infractions in light of all the relevant circumstances." Respondent violated the clear strictures of our Rules of Professional Conduct concerning his conduct in the matrimonial matter. That conduct involved both dishonesty and deceit. It also evinced a disregard for that "bond of trust so essential to the legal profession," *In re Edson*, 108 *N.J.* 464, 473, 530 *A.*2d 1246 (1987), and the continuing "duty to be candid and forthright with the court," *In re Whitmore, supra*, 117 *N.J.* at 477, 569 *A.*2d 252. Fortunately, despite respondent's dissembling, no one was seriously hurt, and the court was not actually misled.

We note that respondent has supplemented the record to include documentation of his history of psychiatric difficulties. We have in the past considered mental illness as a mitigating factor in determining the appropriate level of discipline. *See, e.g., In re Yaccarino*, 117 *N.J.* 175, 193, 564 *A.*2d 1184 (1989). The evidence offered here by respondent is not sufficient to

demonstrate a lack of volition or moral awareness. *In re Jacob*, 95 *N.J.* 132, 137, 469 *A.2d* 498 (1984). In sum, we are convinced that in the matrimonial matter respondent knew what he was doing and that he knew, or should have known, that what he was doing was unethical.

The misconduct relating to the matrimonial matter calls for a suspension from the practice of law. In determining the extent of discipline to be imposed, we also note that respondent has a prior disciplinary history.[3] Respondent's conduct with respect to the handling of the escrow account did not on this record clearly and convincingly demonstrate unethical conduct; the circumstances, however, suggest that respondent could and should have sought clarification of his client's wishes and fully informed his client of the status of the funds before choosing not to pay the doctor's bill and helping himself to his own fees.

### III.

We conclude that respondent should be suspended from the practice of law for a period of three months. He shall reimburse the Ethics Financial Committee for appropriate administrative costs.

So ordered.

*For suspension*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.

---

[3] As the DRB noted, "On December 2, 1986, respondent received a private reprimand for his dual representation of buyer and seller in the sale of a business without full disclosure to both parties of the potential conduct of interest inherent in such representations and the risks involved." The matrimonial matter occurred four months after this private disciplining and the *Servais* matter occurred five months after the private discipline.

## ORDER

It is ORDERED that of STEPHEN P. KERNAN of BRIDGE-TON, who was admitted to the bar of this State in 1981, be suspended from the practice of law for a period of three months, effective April 16, 1990, and until the further order of this Court; and it is further

ORDERED that STEPHEN P. KERNAN reimburse the Ethics Financial Committee for appropriate administrative costs; and it is further

ORDERED that STEPHEN P. KERNAN be restrained and enjoined from practicing law during the period of his suspension; and it is further

ORDERED that STEPHEN P. KERNAN comply with Administrative Guideline Number 23 of the Office of Attorney Ethics dealing with suspended attorneys.