797 A.2d 206 (2002)
351 N.J. Super. 144
Charles KINGSDORF, Guardian of the Person and Property of Jerome J. Kingsdorf, an Incapacitated Person, Plaintiff-Respondent,
v.
Elizabeth KINGSDORF, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted April 22, 2002.
Decided May 20, 2002.
*207 Mona R. Raskin, Linwood, attorney for appellant.
Kathleen Vella, Pleasantville, attorney for respondent.
Before Judges PETRELLA, KESTIN, and STEINBERG.
The opinion of the court was delivered by *208 STEINBERG, J.A.D.
Defendant Elizabeth Kingsdorf appeals from an order enforcing a property settlement agreement which she had allegedly reached with plaintiff Charles Kingsdorf in his capacity as guardian for his father, her now deceased husband, Jerome J. Kingsdorf (Jerome), shortly before Jerome's death. We reverse and remand.
Jerome and defendant were married in January 1984 and had no children together. Each had been previously married. At the time of the marriage, Jerome owned real property located in Mays Landing, New Jersey, and defendant owned real property in Cologne, New Jersey. Subsequent to the marriage, defendant and Jerome executed deeds transferring title of their respective premarital property into joint names as tenants by the entirety. According to defendant, while she was hospitalized after sustaining serious injuries in an automobile accident, Jerome came to the hospital and asked that she execute a mortgage on the Cologne property in order to obtain a $47,000 home equity loan, the proceeds of which were given to plaintiff to allow him to start a new business venture.
The parties separated in 1997. Defendant returned to her home state of Maine, while Jerome resided in the Mays Landing property and also managed the Cologne property. In September 1999, Jerome suffered a stroke which rendered him completely incapacitated. In January 2000, he was placed in a nursing home for long-term residential care. On February 4, 2000, an order was entered declaring Jerome "incapacitated as a result of unsoundness of mind," rendering him incapable of governing himself and managing his affairs. Plaintiff was appointed as guardian of Jerome's person and property.
On March 1, 2000, plaintiff filed a complaint, on Jerome's behalf, for divorce. Defendant, through counsel, filed an answer and counterclaim on May 25, 2000. By letter dated March 15, 2000, plaintiff's attorney, on Jerome's behalf, proposed a settlement whereby Jerome would retain the Mays Landing property and defendant would retain the Cologne property. By letter dated May 22, 2000, defendant's attorney responded, setting forth her belief that the Mays Landing property was substantially more valuable than the Cologne property. In addition, she asserted that the Mays Landing property was unencumbered, whereas the Cologne property was encumbered by the mortgage that was executed for the benefit of plaintiff. Nevertheless, defendant's attorney said that she had advised defendant to "cut her losses" and accept the Cologne property as long as the agreement also provided that each party would keep "any and all assets of any other nature in his or her respective name." After the exchange of further correspondence, by letter dated June 12, 2000, plaintiff's attorney forwarded a copy of a proposed consent final judgment of divorce for defendant's review and signature.
Jerome died on June 23, 2000. The death certificate lists plaintiff as the "informant," Jerome's marital status as "divorced," and designates "not applicable" under the category for "surviving spouse." According to plaintiff, he informed his attorney of Jerome's death on June 27, 2000. However, neither plaintiff nor his attorney informed defendant, her attorney, or the court of Jerome's death.
By letters dated June 27, 2000, and June 29, 2000, defendant's attorney represented that the terms of the consent final judgment of divorce were "acceptable" to her client, indicating that defendant had signed "the copy" and would sign the original at the time of the entry of the final judgment of divorce.
*209 On July 5, 2000, plaintiff, on behalf of the since deceased Jerome, signed the consent final judgment of divorce, which provided for the transfer of the Mays Landing property to Jerome, transfer of the Cologne property to defendant, and waiver by both parties of any claim to alimony or contribution toward support and maintenance from the other. In addition, the consent judgment provided that each party would retain any and all assets in their names or possession.
On July 12, 2000, the return date of the uncontested divorce hearing, defendant signed the consent final judgment of divorce and a quitclaim deed transferring her interest in the Mays Landing property to Jerome. Immediately prior to the hearing, on that same date, plaintiff's attorney informed the court that plaintiff, on Jerome's behalf, had withdrawn his complaint for divorce, thereby allowing defendant to proceed on her counterclaim. Counsel also asked for "permission to leave ... so that [defendant] may proceed on her counterclaim." Counsel failed to reveal that Jerome had died. The following colloquy occurred between the judge and Jerome's attorney:
THE COURT: Okay. At ... this has been signed and negotiated by Charles Kingsdorf?
COUNSEL: Yes, it has been.
THE COURT: Okay. And you represented Charles Kingsdorf throughout this matter?
COUNSEL: Yes, Your Honor, I have.
THE COURT: Okay. Is Mr. Kingsdorf satisfied that the agreement is fair?
COUNSEL: Yes, he is. And he's satisfied that it's in the best interests of his father.
THE COURT: And that it protects his father to the extent possible?
COUNSEL: Yes.
THE COURT: Okay. You don't want to stick around for this?
COUNSEL: No, Your Honor. I am on the panel, so if I could be excused then I can commence with that.
THE COURT: You're excused.
The uncontested divorce hearing then proceeded with defendant, who believed that Jerome was still in a nursing home, representing that she believed the agreement was fair given the facts and circumstances of the case. The court entered a consent final judgment of divorce on that same date.
On August 7, 2000, the Atlantic County Surrogate issued Letters Testamentary naming plaintiff and Larry Kingsdorf as co-administrators of Jerome's estate. On August 15, 2000, defendant sold the Cologne property for $75,000, but received only $19,242.27 in net proceeds after payment of the mortgage, mortgage arrears, and property tax arrears.
On August 21, 2000, plaintiff signed a listing agreement for the sale of the Mays Landing property which had no liens. On October 1, 2000, he entered into a contract of sale for $175,000. However, the title company would not insure the property because defendant had signed the quitclaim deed transferring her interest after Jerome's death. On October 31, 2000, defendant and her attorney learned of Jerome's death when plaintiff's real estate agent requested that defendant execute a new deed transferring title to Jerome's estate. Defendant did not sign the deed.
In November 2000, plaintiff filed a post-judgment motion seeking to enforce the terms of the settlement, enter a judgment of divorce nunc pro tunc to May 22, 2000, and allow him, as co-executor of Jerome's estate, to sign a quitclaim deed on behalf of defendant. In a supporting certification, plaintiff's attorney admitted that on *210 June 27, 2000, she had been advised by plaintiff that Jerome had died on June 23, 2000, and that she had not conveyed that information to opposing counsel or the court, claiming she
truly did not realize [her] oversight until [plaintiff] attempted to sell the ... Mays Landing [property].... The title company advised [plaintiff] that a new Deed had to be prepared transferring title from defendant to [Jerome's estate], since the death of [Jerome] predates the date of the Quitclaim Deed. It was [her] belief that the transfer of title from defendant to [plaintiff] as the guardian of [Jerome] would simply transfer title to the Estate of [Jerome]. [This] was in error.
Thus, plaintiff's attorney asked the judge to enter the divorce nunc pro tunc to May 22, 2000, the date defendant allegedly accepted the terms of the settlement.
In December 2000, defendant filed a cross-motion seeking, inter alia, to vacate the final judgment of divorce; a determination that the deed to the Mays Landing property that she had previously executed in favor of Jerome to be null and void; and a determination that title to the Mays Landing property had passed to her as the surviving spouse and tenant by the entirety by operation of law. She also sought the imposition of attorney fees and costs.
In a supporting affidavit, defendant alleged that plaintiff, as a beneficiary of Jerome's estate, had committed a deliberate fraud upon the court by failing to disclose that Jerome had died. She claimed that prior to entering into the agreement, she had consulted with an estate attorney and, based upon that attorney's advice regarding her potential responsibility for contribution to Jerome's residential nursing care costs, her potential financial responsibility for Jerome, and the effect his care could have on the marital assets, she agreed to give Jerome a greater share of the marital assets in exchange for his waiver of support. She asserted that the equity in the Mays Landing property was $175,000, while the equity in the Cologne property was approximately $19,000. She further asserted that one of the reasons there was only $19,000 in equity in the Cologne property was the failure of Jerome to pay the mortgage or real estate taxes "for a considerable time." She claimed she was
induced to make a bargain to essentially give up the entire estate in order to provide for what [she] envisioned to be [Jerome's] needs for expensive long-term care at a point in time when the plaintiff and his attorney knew that [Jerome] was dead and that there was no consideration for this transfer and no need for what were essentially all of the assets to be relegated for the long-term residential nursing care costs for [Jerome].
She contended that the failure to "mention" Jerome's death prior to the divorce was not an "oversight" as claimed, but was instead a "deliberate attempt" to defraud her.
On December 15, 2000, the return date of the cross-motions, the judge vacated the final judgment of divorce, concluding that plaintiff had an obligation to inform counsel and the court that his father had died. The judge also erroneously said, "I want the record to be clear that I have nothing to indicate to me that [plaintiff's counsel] at least knew on the day that the divorce was entered that [Jerome] was no longer living. I don't ascribe any bad faith to her."[1] The judge reserved decision, pending *211 submission by the parties of further briefs, on the question whether the parties had reached an enforceable agreement prior to Jerome's death.
In a subsequent written opinion dated April 27, 2001, the judge determined that plaintiff, as Jerome's guardian, had standing and that the Family Part had jurisdiction to resolve the dispute. He also concluded that the parties had reached a valid agreement prior to Jerome's death, and that the agreement was enforceable because it was not unconscionable. The judge explained that defendant had reached an agreement with plaintiff to accept a smaller share of the assets in return for a waiver of spousal support, and that he would "not undo what the parties had agreed upon simply because the defendant may have gotten a better deal if she had waited longer to reach an agreement with the plaintiff." Thus, the judge granted plaintiff's request to enforce the terms of the settlement and to transfer title to the Mays Landing property to Jerome's estate. In addition, the judge denied defendant's application for counsel fees on the basis that she had failed to submit an affidavit of services, as required by R. 4:42-9(b), and also because plaintiff had been successful in pursuing the motion.[2]
On this appeal, defendant raises the following arguments:
POINT I
A COURT OF EQUITY SHOULD NOT GRANT RELIEF TO ONE WHO WAS A WRONGDOER WITH RESPECT TO THE SUBJECT MATTER OF THE SUIT. THE LEVEL OF FRAUD, BAD FAITH AND UNCONSCIONABLE MISREPRESENTATION IN THE PRESENCE OF THE COURT REQUIRED THE COURT TO INVOKE THE DOCTRINE OF UNCLEAN HANDS. FAILURE TO DO SO WAS A MISTAKEN EXERCISE OF DISCRETION.
POINT II
THE TRIAL COURT ERRED IN ITS APPLICATION OF RELEVANT LEGAL PRINCIPLES CONCERNING STANDING, JURISDICTION AND THE INTERPRETATION OF THE COURT'S EQUITABLE POWERS UNDER CARR V. CARR AND KRUZDLO V. KRUZDLO.

DIVORCE ABATES UPON DEATH, EQUITABLE DISTRIBUTION CANNOT EXIST IN THE ABSENCE OF A DIVORCE AND THE EQUITABLE REMEDIES UNDER CARR V. CARR ARE NOT AVAILABLE TO DECEDENT'S HEIRS.
POINT III
NO BINDING AGREEMENT CAN EXIST IN THE ABSENCE OF CONSIDERATION. NO BINDING AGREEMENT CAN EXIST IN THE ABSENCE OF ACCEPTANCE.
POINT IV
AN AGREEMENT BETWEEN SPOUSES CAN ONLY BE ENFORCED IF FOUND TO BE FAIR AND EQUITABLE AT TRIAL.
POINT V
DEFENDANT WAS ENTITLED TO COUNSEL FEES, COMPENSATORY AND PUNITIVE DAMAGES, NOTWITHSTANDING THE TRIAL COURT'S DECISION TO TRANSFER TITLE TO THE REAL ESTATE TO PLAINTIFF'S ESTATE.
As Jerome's guardian, plaintiff had standing to file the complaint for divorce *212 on Jerome's behalf. N.J.S.A. 2A:34-14 (allowing guardian to prosecute or defend an "action respecting the marriage status ... of his ... ward"); Kronberg v. Kronberg, 263 N.J.Super. 632, 640, 623 A.2d 806 (Ch. Div.1993) (authorizing guardian to obtain a divorce on behalf of someone who lacks the capacity to make that decision). However, ordinarily, "[d]ivorce proceedings abate with the death of one of the parties." Carr v. Carr, 120 N.J. 336, 342, 576 A.2d 872 (1990); accord Castonguay v. Castonguay, 166 N.J.Super. 546, 549-50, 400 A.2d 130 (App.Div.1979). In addition, plaintiff lacked standing to sign the final consent judgment of divorce because Jerome's death terminated his guardianship. See N.J.S.A. 3B:12-64 ("The authority and responsibility of a guardian ... terminate[s]... upon the death of the ... incompetent...."). Furthermore, N.J.S.A. 2A:34-23(h) authorizes the equitable distribution of marital assets only upon the granting of a divorce, providing, in pertinent part: "In all actions where a judgment of divorce... is entered[,] the court may make such award ... to effectuate an equitable distribution of the property, both real and personal, which was legally and beneficially acquired by them or either of them during the marriage."
We are deeply troubled by the deception perpetrated by plaintiff. As previously noted, in supplying the information for Jerome's death certificate, he said Jerome was divorced, and also designated "not applicable" under the category for "surviving spouse." According to plaintiff, on June 27, 2000, he informed his attorney of Jerome's death, but neither he nor his attorney informed defendant, her attorney, or the court. Moreover, we have serious reservations concerning the representation of plaintiff's attorney that her failure to advise her adversary or the court of Jerome's death was a mere "oversight."
"The failure to disclose a material fact to a tribunal is an ethical violation under R.P.C. 3.3(a)(5)." In re Forrest, 158 N.J. 428, 433, 438, 730 A.2d 340 (1999) (noting that "[m]isrepresentation of a material fact to an adversary or a tribunal in the name of `zealous representation' never has been nor ever will be a permissible litigation tactic"). A lawyer's responsibility to act with "[c]andor and honesty necessarily requires disclosure of significant facts, even though the disclosure might not be in the interest of the client." Davin, L.L.C. v. Daham, 329 N.J.Super. 54, 76, 746 A.2d 1034 (App.Div.2000). "An attorney is not merely a hired gun, but, rather, a professional required to act with candor and honesty." Ibid. "Lawyers have an obligation of candor to each other and to the judicial system, which includes a duty of disclosure to the court and opposing counsel." McKenney ex rel. McKenney v. Jersey City Med. Ctr., 167 N.J. 359, 371, 771 A.2d 1153 (2001). While the Rules of Professional Conduct do not provide an independent cause of action, they still should be considered by the court in determining, balancing, and weighing the equities of the parties. See Davin, supra, 329 N.J.Super. at 74, n. 3, 746 A.2d 1034. Here, plaintiff's false statements in obtaining Jerome's death certificate, coupled with his failure, along with the failure of counsel, to disclose Jerome's death to opposing counsel and the court, resulted in the perpetration of a fraud upon the court and the obtaining of a divorce by subterfuge. We conclude that plaintiff's conduct in creating this sham is so reprehensible that the subsequent judgment requiring defendant to execute a deed in his favor cannot be affirmed in the context of the divorce proceedings. This result is dictated by the requirements of fairness and equity, as well as by application of the legal principles to which we have referred. Plaintiff's *213 fraudulent conduct, and his attorney's participation in it, cannot be deemed inconsequential.
If plaintiff has any equitable basis for seeking enforcement of the settlement agreement apart from the divorce, his claim must be addressed in a framework independent of the complaint for divorce, with the judge considering and sorting out the equities of the claims in the light of prevailing rules of law. Under the statute, a court only has the power to order equitable distribution in the context of a divorce. With Jerome's death, the derivative claim of "equitable distribution under the statute... became unattainable." Carr, supra, 120 N.J. at 342, 576 A.2d 872. Although "in highly unusual circumstances some aspects of statutory equitable distribution and related forms of relief ... may survive a spouse's death before divorce," the unusual circumstances of this case, particularly the failure to disclose the death of Jerome, does not warrant departing from the well-settled principle that the proceedings abated upon Jerome's death. See ibid. Thus, we conclude that the complaint should have been dismissed without prejudice to plaintiff's right to file a new complaint seeking appropriate relief. Simply put, the egregious nature of plaintiff's misconduct requires dismissal of his complaint and the requirement of the filing of a new complaint framing the issues as they now exist.
In his written opinion, the judge did not address defendant's contention that the doctrine of unclean hands should be applied against plaintiff to defeat his claim. "The essence of that doctrine ... is that `[a] suitor in equity must come into court with clean hands and he must keep them clean after his entry and throughout the proceedings.'" Borough of Princeton v. Bd. of Chosen Freeholders, 169 N.J. 135, 158, 777 A.2d 19 (2001) (alteration in original) (quoting A. Hollander & Son, Inc. v. Imperial Fur Blending Corp., 2 N.J. 235, 246, 66 A.2d 319 (1949)). "In simple parlance, it merely gives expression to the equitable principle that a court should not grant relief to one who is a wrongdoer with respect to the subject matter in suit." Faustin v. Lewis, 85 N.J. 507, 511, 427 A.2d 1105 (1981). Consequently, "where the bad faith, fraud or unconscionable acts" of a party seeking equitable relief form the basis of his contention, equity may deny him its remedies. Rolnick v. Rolnick, 262 N.J.Super. 343, 362, 621 A.2d 37 (App.Div.1993).
Application of the doctrine is discretionary with the court. Princeton, supra, 169 N.J. at 158, 777 A.2d 19. "`The inequity which deprives a suitor of a right to justice in a court of equity is not general iniquitous conduct unconnected with the act ... which the complaining party states as his ground or cause of action.'" Heuer v. Heuer, 152 N.J. 226, 238, 704 A.2d 913 (1998) (quoting Neubeck v. Neubeck, 94 N.J. Eq. 167, 170, 119 A. 26 (E. & A.1922)). Rather, "it must be evil practice or wrong conduct in the particular matter or transaction in respect to which judicial protection or redress is sought." Neubeck, supra, 94 N.J. Eq. at 170, 119 A. 26.
We recognize that the judge concluded that an agreement had been reached prior to Jerome's death. Consequently, it could be argued that the doctrine of unclean hands should not be applied as the agreement had been reached before Jerome's death and before plaintiff's misconduct occurred. In our view, application of the doctrine should not be rejected on that basis. At the moment of Jerome's death, the landscape changed dramatically. By virtue of Jerome's death, defendant became the legal owner of both properties, as a result of her right of survivorship. Thus, if a new complaint is filed, the judge *214 should consider the doctrine of unclean hands and other equitable concepts in determining whether, and to what extent, plaintiff's conduct affects his right to relief in whole or in part.
A court of equity has considerable discretion, applying equitable principles, to condition the relief it gives a litigant. Morsemere Fed. Sav. & Loan Ass'n v. Nicolaou, 206 N.J.Super. 637, 645, 503 A.2d 392 (App.Div.1986). The court must exercise its inherent equitable jurisdiction and decide the case based upon equitable considerations. "Applying principles of fairness and justice, a judge sitting in a court of equity has a broad range of discretion to fashion the appropriate remedy in order to vindicate a wrong consistent with the principles of fairness, justice, and the law." Graziano v. Grant, 326 N.J.Super. 328, 342, 741 A.2d 156 (App.Div.1999). Hence, the trial court must give consideration to the gross disparity in the equity of the home defendant agreed to accept and the home Jerome agreed to accept, particularly in light of the fact that defendant accepted the home she brought into the marriage, which became encumbered during the marriage by a mortgage which was executed to provide plaintiff, Jerome's son by his former marriage, with funds for his new business venture.
We are also mindful of other equitable maxims. For example, "he who seeks equity must do equity." Morsemere, supra, 206 N.J.Super. at 645, 503 A.2d 392. In addition, "equity regards as done that which ought to be done." Graziano, supra, 326 N.J.Super. at 342, 741 A.2d 156. Likewise, "a court of equity should not permit a rigid principle of law to smother the factual realities to which it is sought to be applied." Ibid. Consequently, the mere fact that an agreement may have been reached prior to Jerome's death does not necessarily require that the agreement be specifically enforced, if reflective application of equitable considerations and principles suggests a different remedy.
We next consider defendant's contention that the judge erred in denying her application for an award of counsel fees. R. 4:42-9(a)(1) permits the court, in its discretion, to make an allowance for counsel fees and costs in a family action. In addition, N.J.S.A. 2A:34-23 provides, in part:
Whenever any other application is made to a court which includes an application for pendente lite or final award of counsel fees, the court shall determine the appropriate award for counsel fees, if any, at the same time that a decision is rendered on the other issue then before the court and shall consider the factors set forth in the court rule on counsel fees, the financial circumstances of the parties, and the good or bad faith of either party.
R. 5:3-5(c) allows the court, in its discretion, and subject to the provisions of R. 4:42-9(b), (c) and (d), to make an allowance in family-type matters. The court must consider, in addition to the information required by R. 4:42-9, the following:
(1) the financial circumstances of the parties;
(2) the ability of the parties to pay their own fees or to contribute to the fees of the other party;
(3) the reasonableness and good faith of the positions advanced by the parties;
(4) the extent of the fees incurred by both parties;
(5) any fees previously awarded;
(6) the amount of fees previously paid to counsel by each party;
(7) the results obtained;
(8) the degree to which fees were incurred to enforce existing orders or to compel discovery; and
*215 (9) any other factor bearing on the fairness of an award.
[R. 5:3-5(c).]
However, R. 4:42-9(b) requires that an application for counsel fees and costs "be supported by an affidavit of services addressing the factors enumerated by R.P.C. 1:5(a)." Here, defendant failed to submit an affidavit of services as required by R. 4:42-9(b). The judge denied defendant's request for counsel fees in light of her failure to produce the necessary certification. He also concluded that because he had ruled in favor of Jerome's estate, "it would be inequitable to assess legal fees against the estate in favor of defendant." The fact that defendant did not prevail does not necessarily preclude an award of counsel fees to her. See R. 5:3-5(c) (stating that counsel fees may be awarded to "any party to the action" (emphasis added)); Anzalone v. Anzalone Bros., 185 N.J.Super. 481, 487, 449 A.2d 1310 (App. Div.1982) (recognizing that counsel fees could be awarded to "either the husband or the wife irrespective of that party's success in the matrimonial action").
Thus, we remand, and require that the judge give defendant an opportunity to provide the appropriate certification and allow her to renew her request for an award of counsel fees. The judge should particularly take into consideration plaintiff's bad faith in withholding from defendant and the court the fact that Jerome had died prior to the hearing for divorce. Once that application is ruled upon, the complaint shall be dismissed without prejudice.
Finally, although not necessary for our decision in light of our conclusion that the complaint must be dismissed, we consider defendant's contention that the judge erred in retaining jurisdiction once it was determined that Jerome had died. The Family Part has subject-matter jurisdiction in "[a]ll civil actions in which the principal claim is unique to and arises out of a family or family-type relationship." R. 5:1-2(a). It is beyond dispute that when the action was first commenced, it was properly filed in the Family Part. However, as previously noted, the divorce proceeding abated upon the death of Jerome and, in addition, plaintiff's authority to act as Jerome's guardian ceased upon Jerome's death. Once Jerome died, defendant became, by operation of law, the holder of legal title to both properties. Any claim on Jerome's behalf must be asserted by his estate. Presumably, the claim would be based upon the contention that an agreement had been reached prior to Jerome's death. The claim to be asserted is neither unique to, nor arises out of, a family or family-type relationship necessitating its being filed in the Family Part, or requiring the application of a Family Part judge's expertise. See generally Lopatkin v. Lopatkin, 236 N.J.Super. 555, 557-58, 566 A.2d 559 (Ch.Div.1989). Thus, we conclude that if the estate files a new complaint, it should be filed in the Chancery Division, General Equity Part.
Reversed and remanded to the Family Part for reconsideration of defendant's application for counsel fees. Defendant's attorney must submit the necessary affidavit of services prior to consideration of the claim. Once that application is ruled upon, the complaint shall be dismissed without prejudice to the right of Jerome's estate to file a new complaint. All further proceedings shall be consistent with this opinion.[3]
NOTES
[1] As previously noted, in her supporting certification, plaintiff's attorney had conceded that she was advised prior to the divorce of Jerome's death.
[2] Subsequent to the filing of the notice of appeal, the parties agreed to allow the Mays Landing property to be sold with the net proceeds from the sale to be held in escrow pending resolution of the appeal.
[3] Simultaneous with the filing of this opinion, we have referred this opinion to the Office of Attorney Ethics for its consideration of the conduct of plaintiff's attorney. See generally Forrest, supra, 158 N.J. at 438, 730 A.2d 340 (finding plaintiff's counsel's "nondisclosure of [client's] death deceived both his adversary and the arbitrator about a fact that was crucial to the fair and proper resolution of the litigation").